# CASES ARGUED AND DECIDED

IN THE

# SUPREME COURT OF MISSISSIPPI,

AT THE

APRIL TERM, 1891.

---

## ILLINOIS CENTRAL RAILROAD CO. *v.* O. C. PETERSON.

1. RAILROADS. *Transportation of live stock. Special contract. Case.*
   Where, under a special freight contract, a railroad company furnishes an entire box-car to a shipper, who loads it with "emigrant movables" and several horses, the contract requiring him to load and unload the car and to accompany it, and feed, water and care for the stock, all at his own risk and expense, and exempting the company from liability for delays of the train, and there is no agreement as to any lay-out along the route, and the stock can be fed and watered without leaving the car, the owner does not, in the absence of a custom to that effect, acquire by such contract the right to have the car stopped and laid out along the route that he may rest his horses and re-arrange his load.

2. SAME. *Special contract. Right to stop and unload.*
   If, by the owner's method of arranging the horses in the car, they can only be taken out with great trouble and delay, and a lay out on the route becomes necessary to save the horses from suffering or death, this does not entitle the owner, shipping under such contract, to demand that the car be laid out and afterwards carried under the same contract. The owner can only secure such delay by abandoning his contract, or by contracting anew for the use of the car for a longer time. If he does not do this, the company may refuse to lay out the car and is not liable for injury to the animals caused by the continuous journey.

3. FAILURE TO UNLOAD AND WATER LIVE STOCK. *Rev. Stat. U. S.* § 4386.
   In an action by such shipper against the railroad company to recover for injury to live stock caused by its failure to allow such lay-out, whereby the stock died, the right of the parties will not be measured or affected

by § 4386 Rev. Stat. of the U. S., which provides that animals trans-
ported on railroads shall be unloaded, watered, fed and rested at certain
intervals, and provides a penalty, recoverable in the federal court, for
every violation of the act. The state courts are in no way concerned
with the enforcement of this statute.

FROM the circuit court of the first district of Hinds county.

HON. J. B. CHRISMAN, Judge.

The appellee brought this action against the Illinois Central
Railroad Company to recover for the death of two horses, and in-
jury to several others, resulting from the alleged carelessness and
wanton negligence of the employés of said company, and their
neglect of said horses while being transported over defendant's rail-
road. The cause was tried at the June term, 1890, of the circuit
court, and resulted in a peremptory instruction to find for the de-
fendant, but afterwards, at the same term, the court sustained the
motion of plaintiff for a new trial. The cause came on for trial at
the succeeding term, upon substantially the same evidence, and
resulted in a verdict and judgment for plaintiff.

The special freight contract referred to in the opinion, and under
which the horses and other property were being transported, con-
tains the following provisions :—

"At the rates above stated the owner is to feed, water and take
care of his stock at his own expense and risk, and is to assume all
risk of injury or damage that the animals may do to themselves, or
to each other, or which may arise from delay of trains. . . . . Live
stock in car-loads will not be taken at the ·car-load rates, unless
this contract, under which the company assumes no responsibility
for loss, damage or delay to the stock, is executed by the station
agent and shipper ; and is to be loaded and unloaded, watered and
fed by the owner at his risk in all respects, except as specified in
the contract."

The contract was signed by Peterson and by the agent of the
railroad company at Chicago. Peterson, pursuant to the terms of
the contract, loaded the car and accompanied it in its journey from
Chicago, Ill., to its destination at Jackson, Miss.

The facts, as found by the court from the record, are stated in

the opinion.  We will add, however, that after the refusal of the agent at Centralia to allow the car to be taken out of the train and laid over to await another train, the train containing appellee's car was delayed several hours; but appellee explained his failure to then take out the horses and re-arrange his load upon the ground that he did not know how long the delay would continue, and because the car was not, during the delay, at a platform.  The car proceeded southward from Centralia without encountering other delays, and, so far as the evidence discloses, without any regard being paid to the condition of the stock until it arrived in Jackson, after having been on the road continuously about eighty hours. Before reaching Jackson two of the horses were dead, and the others were badly injured.

Peterson brought suit to recover the sum of $1000 from the railroad company, $400 of the amount demanded being for punitive damages.  The second verdict and judgment was for $1000, but on the hearing of the motion to set it aside, plaintiff entered a remittitur for all in excess of the actual value of the animals and compensation for the injury as shown by the evidence.  The motion for a new trial was overruled, and defendant appeals.

*W. P. & J. B. Harris,* for appellant.

Railroads are not common carriers of live stock unless they choose to make themselves so by contract, or by holding themselves out to the public as such.  2 Rorer on Railroads, 1299 *et seq.* ; 3 Am. & Eng. Ency. Law, 1–8.

The special contract will govern in this case as to the liability. It has been held that an exemption from liability except for damage by collision or running off the track is reasonable.  66 Ga. 485 ; 22 Wis. 511.

In this case the defendant merely hired the car to plaintiff.  It had nothing to do with loading it or with the care of the stock. All this devolved on the shipper.  In such case the railroad company does not incur any risk as to the mode adopted in loading the car.  20 Ill. 623.

The contract here must be construed by the law of Illinois, and

the exemption from liability is there recognized as valid.   83 Ill. 273 ; 42 Ib. 474.

A shipper who has chartered a car cannot look to the company for damage in case of injury to his property as a common carrier. His remedy must be on the contract of hire, and the implied undertaking of the company that the hired cars are substantial and will be duly carried to the point of destination.   27 Ga. 535 ; 75 Ala. 596.

Where the owner, by agreement, loads and unloads the car, the burden of proof as to that is no longer on the company but on him to show negligence.   9 Bush (Ky.), 645.

For another reason plaintiff cannot recover.   Although given ample time, he had so arranged his load that the horses could not be taken from the car without much trouble and delay.   His own carelessness created the necessity for the delay, and he had no right to demand that his car be laid out for twenty-four hours that he might repair what his own carelessness had entailed upon him. The employés were certainly not required to suspend all the rules of the company for his benefit.   He admits that he made no demand at Centralia that the car be finally dropped from the train.

Section 4386, rev. stat. U. S., has no application in this case. That is a penal statute enforced only in the federal courts.   It cannot be invoked here as a standard of negligence.   Besides, if the statute was violated, there is a specific remedy given by suit for a penalty in another forum.

*E. E. Baldwin,* for appellee.

The railroad company acted in direct violation of the United States statute regulating the transportation of animals.   It is required by § 4386, rev. stat. U. S., that the railroad company unload, water, feed and rest, for at least five hours out of every twenty-eight, all animals being transported.   Failure to observe this rule is not only wilful but criminal negligence.   It is well established that the liability of carriers of live stock is the common-law liability of common carriers of other property, subject only to the qualification that the carrier may be excused where the loss is

attributable to the intrinsic qualities or nature of the animals, provided the carrier itself is free from negligence, or is exempted by some valid contract. This is the rule in Mississippi. *Chicago, etc. R. R. Co.* v. *Abels,* 60 Miss. 1017.

It is also the rule in Illinois. *R. R. Co.* v. *Crabtree,* 19 Ill. 136 ; *R. R. Co.* v. *Dunbar,* 20 Ib. 623 ; *R. R. Co.* v. *Dorman,* 72 Ib. 504.

Where hogs in course of transportation become heated, and the carrier when informed of it neglected to apply water to them, it was held liable for the injury from such neglect. *R. R. Co.* v. *Adams,* 42 Ill. 474 ; *R. R. Co.* v. *Thompson,* 71 Ib. 434. So where a car-load of hogs was delayed twelve hours without being attended to, and the hogs were injured, the carrier was held responsible. *Kinnick* v. *R. R. Co.,* 27 Am. & Eng. R. R. Cas. 55.

Where negligence of the carrier is the primary cause of the injury, although, but for the nature and propensities of the live stock carried, no loss need have resulted, the carrier is responsible. 32 Pa. St. 414 ; 27 Ga. 535 ; 81 Ill. 504 ; 10 Ohio St. 65.

The railroad company cannot complain that the car is badly loaded, even if that be proved, as it is bound to see that this is properly done before accepting it for transportation. *Kinnick* v. *R. R. Co., supra.* Even when the negligence of the carrier is combined with the cause of the loss excepted by law or the terms of the contract, the carrier is none the less liable. *Oxley* v. *R. R. Co.,* 65 Mo. 629.

I submit appellant is shown to have been grossly and criminally negligent, and liable for the damages recovered.

Argued orally by *J. B. Harris,* for appellant, and *E. E. Baldwin,* for appellee.

WOODS, C. J., delivered the opinion of the court.

Under the special contract in evidence, and under which the appellee seeks a recovery, the defendant corporation let to appellee an entire car to be used by him in the transportation of what is denominated "emigrant movables," consisting, in this instance, of six horses and a lot of miscellaneous property—corn, feed-stuff,

furniture, etc.  The car was under the charge and in the care of appellee, was loaded by him at his own discretion, and was held in the defendant's yards at Chicago, to meet appellee's wishes, for about three days, in order to permit him to complete his load, and this while the horses were all on the car, they having been loaded at a point thirty miles north of Chicago.  The contract stipulated, for the railroad company, against liability on its part, except for injuries resulting from collisions or derailment in transportation. That the railroad limited its liability for wilful injuries or gross negligence is not contended by its counsel.  By this special contract, the appellee agreed to feed, water and take care of his stock, and to load and unload the animals, and to exempt the railroad company from loss occurring by jumping from the cars, delay of trains, or any damage the stock might sustain, except such as should result from collisions or derailment of cars in course of transportation.

Suitable provision was made for feeding and watering the stock on the car, and they were properly fed and watered by appellee, who accompanied the stock, without further charge than the price paid for the use of the car.

After the stock had been loaded and kept confined in the car for nearly three days, the appellee completed his additional loading, and the car was taken in charge by appellant to be transported on its route to Jackson, Mississippi.

The next day after leaving Chicago, appellee discovered that one of the young stallions was down in the car.  He got it up, but before reaching Centralia, and about a day after the journey had been begun, the same young animal was found down again, and, as was thought by appellee, to be down finally, as he expresses it. On reaching Centralia, appellee made application to the railroad company's agent to be laid out for twenty-four hours, to the end that he might re-arrange his load (then plainly seen to have been improperly loaded) and to rest his stock, which application was not accepted and complied with, though the car of appellee was actually taken out of the train in which it was being carried, and was permitted to lie at Centralia for a few hours—a time too short, how-

ever, as appellee thought, to afford him opportunity to unload, rest his stock and re-arrange the load.

The question, then, which meets us on the threshold of the case, and whose determination by us may prove conclusive of the entire controversy, is, had the appellee the right to demand thàt he be laid out at Centralia ?

If he had this right, how was it acquired ? Was it an implied obligation resting upon the railroad ? If it finds rest under the contract, it will be found by implication. There is no express obligation of this character appearing in the face of the instrument. If it was an implied obligation on the railroad, how is the implication raised ? If it was the custom of the railroad company to lay out cars in which a few horses were carried, then there was an implied obligation assumed to comply with such custom, on the part of the railroad. But the undisputed evidence perfectly shows, that while it was the custom to lay out car-load lots of animals every 24 or 28 hours, in order that they might be fed, watered and cared for, no such custom prevailed or existed in cases where a few animals only were loaded in a car, and where provision was made thereon for watering and feeding the animals. The custom was unknown in cases of the latter character. Nor does the absence of the custom seem unnatural, there being no necessity, apparently, in ordinary cases, for any unloading. The cases referred to by appellee's counsel in 42 Illinois, 474, and 71 Ib. 434, raised an implied obligation on the carrier to throw water on hogs crowded in a car, because of the known custom of railroads to so apply water to that particular animal. The other case relied upon by counsel for appellee is that of *Kinnick v. R. R. Co.*, 27 Am. & Eng. R. R. Cases, 55. In that case the railroad company received a car-load of hogs from plaintiff, and after loading and starting them on their journey, there was such delay, by reason of the wrecking of another train, that a number of the hogs died, and the court held, as it was a natural propensity of hogs to struggle to get near to or away from the doors of a car, when it is left standing, and to " pile up" on each other in such struggles, and thereby produce injury or death, and as it appeared that the injuries com-

plained of were attributable to the failure of the railroad company to give the animals any attention during the twelve hours during which the train was standing still, because of the obstructing wreck, that the company was liable because of its negligence, in this extraordinary danger to the animals, in failing to do what the delay and consequent peril to the animals required should be done. We fail to see any support, in any of these cases, for the proposition that there was an implied obligation, in the case at bar, upon the railroad company to lay out the car, which appellee had hired, for twenty-four hours, at Centralia. The contrary is involved in these decisions, as we understand them.

In the absence of any custom imposing obligation to lay out on the appellee, what is there in the conduct of the parties to the contract before us which will authorize us to say that any purpose to lay out the car, after it had been started on its way to its destination, was in the minds of the company and the appellee? What is the foundation for implying that the minds of the parties ever dwelt upon or met in any unexpressed agreement that appellee should have such right? We have been unable to find any circumstance, even, which tends to support that proposition. On the other hand, there is much in the evidence of the appellee which strongly shows that he regarded the use of the car as confined to one continuous trip. He placed three horses in each end of the car, and then partitioned both ends in front of the horses, their heads being toward the middle doors of the car. He likewise made stalls for the horses, respectively, within the partitioned spaces, and then he proceeded to fill up the vacant space in the middle of the car with a large quantity of corn and other feed-stuff, household goods, etc. The whole arrangement of the car-load, as made by the appellee, precluded the unloading of the car, unless with much labor and considerable time. It is perfectly apparent that neither when the contract was executed, nor when the car was loaded, was there any thought of having a lay-out accorded him while on the way, in the mind of appellee himself, even. We fail to find any ground for maintaining that there was any implied obligation, under the contract, to give appellee the desired lay-out.

It is said by counsel for appellee that by § 4386, revised statutes of U. S., a definite rule for the transportation of animals is created, and penalties prescribed for disregard of the rule. With this rule, and its enforcement, the courts of the state are no way concerned. But the act itself, in a subsequent section, provides for the recovery of the penalty in a civil action in the proper federal court. It is waste of words to say more.

Is there an obligation, founded in common humanity, which required the railroad company to lay out appellee's car, in order that dumb brutes may have relief from suffering and rescue from death? It is not necessary for us to answer. The evidence satisfies us that the appellee did not himself think the stock in the condition indicated in the foregoing question when he made his request at Centralia to be laid out. Surely it cannot be believed that if he then knew, or had reason to know, that very valuable stallions [one of which he had paid $800 for] and valuable mares, were in peril of impending death or serious injury, self-interest, as well as humanity, would not have constrained him to make a new contract for longer use of his car, or, if necessary, to abandon altogether his then contract with the railroad company, and take the chances of the trifling loss of sixty dollars which he had bound himself to pay the railroad, by then and there unloading his car and leaving the train.

It is manifest that by keeping his stock on the car for three days before starting them southward from Chicago, and by so loading the car as to render it impossible to take the stock out without great trouble and delay, the appellee had placed himself in the unfortunate situation which confronted him at Centralia, and from which he could only extricate himself by making a new contract for the use of the car for a longer time than originally thought needful, or by abandoning his contract altogether, and removing his stock from the train.

As these views, for the present, appear to cut up by the roots appellee's contention, we find it unnecessary to express any opinion on any other point involved.

*Reversed and remanded.*